IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT SINGLETON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:20-cv-898-ECM |
| | ) | [WO] |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION and ORDER**

## **I. INTRODUCTION**

Plaintiff Robert Singleton, Jr. ("Plaintiff" or "Singleton"), who is African-American, brings his action against his employer, the City of Montgomery ("Defendant" or "the City"). The Plaintiff brings claims of race discrimination, retaliation, and hostile work environment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). His claims arise out of, among other things, the Defendant's failure to promote him and disciplining him on a number of occasions.

Now pending before the Court is the Defendant's motion for summary judgment. (Doc. 24). The Plaintiff filed a response in opposition to the motion, the Defendant filed a reply, and the Plaintiff filed a sur-reply; the Defendant's motion is ripe for review. Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the Defendant's motion for summary judgment is due to be granted.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and the jurisdictional grant found in 42 U.S.C. § 2000e-5(f)(3).  Personal jurisdiction and venue are uncontested.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element

2

of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTS

The facts, stated in the light most favorable to the non-movant, are as follows:

In 2001, Mr. Singleton began his employment with the City as a tire shop mechanic in the City's Fleet Management Department ("Fleet").   In 2014, Mr. Singleton was promoted to Master Mechanic within Fleet.  Master Mechanic is a supervisory position.

Mr. Singleton has maintained his position as Master Mechanic since 2014.  In 2016, Mr. Singleton transferred from the Heavy Equipment Division to the Preventive Maintenance Crew.  Sometime thereafter, Mr. Singleton transferred to the Service Center Division.  Fleet had not previously had a Master Mechanic in the Service Center.  Mr. Singleton also was Acting Superintendent in the Heavy Equipment Division for approximately eighteen months beginning sometime in 2017 or 2018.

As set out in further detail below, the actions Mr. Singleton challenges in this lawsuit occurred between 2018 and 2020.  During this period, Mr. Singleton had three different direct supervisors: Oscar Thames, Steve Lammon, and Ronnie Rafferty.  The record is unclear as to when Mr. Singleton's direct supervisor changed.  However, the Court gleans from the record that Mr. Lammon was Mr. Singleton's direct supervisor in August 2018, Mr. Thames was Mr. Singleton's direct supervisor in December 2018, Mr. Lammon was again Mr. Singleton's direct supervisor for some time in the first half of 2019, and Mr. Rafferty was Mr. Singleton's direct supervisor beginning on or around June 4, 2019.  At all relevant times, Walter Lilley was the Director of Fleet and next in the chain of command above Mr. Singleton's direct supervisor.  At all relevant times, Tom Pierce, the Director of General Services for the City, was Mr. Lilley's direct supervisor.

The Alabama Legislature created the Montgomery City-County Personnel Board ("the Board") to oversee human resources activities of the City of Montgomery, including Fleet.  Carmen Douglas, the Director of the Board, explained that the Board is responsible for announcing and advertising for a job opening, determining which candidates meet the minimum qualifications for the job, and, if there are more than five qualified candidates,

4

ranking those candidates. Then, the Board provides the Department with a certified list of the top five candidates for the position, and the Department may choose from those top five candidates. The Department may not select a candidate outside the top five certified by the Board, even if more than five candidates meet the minimum job qualifications. Thus, the top five candidates are those who are eligible to be selected for the job.

On July 17, 2018, Mr. Singleton applied for an open Garage Superintendent position within Fleet. He was one of four candidates who was qualified for the position. Reginald Farrish, an African-American, was ultimately selected for the position.

On August 10, 2018, Mr. Lammon, at Mr. Lilley's direction, disciplined Mr. Singleton based on the perception that Mr. Singleton was using his City-issued cell phone for personal reasons. After Mr. Singleton complained to Mr. Lilley and presented evidence that he was not using his phone for personal reasons, Mr. Lilley removed the disciplinary action from Mr. Singleton's file,[1] and it did not result in further discipline, loss of pay, or loss of benefits.

On August 31, 2018, Mr. Singleton's coworker, Leo Davis, provided him a letter and asked him to deliver it to Mr. Lilley (hereinafter the "Davis letter"). The letter contained Mr. Davis' complaints that Fleet management had discriminated against him. Mr. Singleton delivered the Davis letter to Mr. Lilley on September 4, 2018. Mr. Singleton did not assist Mr. Davis in drafting the letter, nor did he read the letter

---

[1] Mr. Lilley insists this disciplinary action was never implemented; Mr. Singleton insists Mr. Lilley removed it from Mr. Singleton's file after he complained. At summary judgment, the Court must view the evidence in the light most favorable to Mr. Singleton.

before delivering it to Mr. Lilley.

On or about September 20, 2018, Mr. Singleton and Mr. Davis drafted a second letter listing complaints about discriminatory practices within Fleet, specifically referencing the allegedly disparate treatment of African-Americans by Mr. Lilley.[2]   The second letter, which included complaints specific to Mr. Singleton, was presented by Mr. Davis to Ms. Douglas on September 28, 2018.   William "Mark" Willis, Senior Personnel Analyst in the City's personnel department, investigated the complaint and interviewed several witnesses, including Mr. Singleton.   During the interview, Mr. Singleton complained about the incident in which he was disciplined for allegedly using his City-issued cell phone for personal reasons.   In February 2019, Mr. Willis issued a report with findings and recommended corrective action.   Mr. Willis substantiated[3] the following complaints: (1) Mr. Lilley does not adhere to the sick leave policy because he requires some employees to come to work to "verify" their illnesses; (2) Mr. Lilley's discipline policies are unfair or unjust—specifically that they are "strict" and "out of line with other city departments," and that there has been a "lack of consistency in administration and enforcement of policies"; (3) Mr. Lilley "put his hands on" Mr. Davis on one occasion; (4) Mr. Lilley hand-picked people to try out for

---

[2]  The City argues that there is no evidence Mr. Singleton helped or participated in drafting this letter with Mr. Davis.  However, Mr. Singleton testified in his deposition that he helped Mr. Davis draft a second letter.  The letter is not in the record.  At summary judgment, the Court must view the evidence in the light most favorable to Mr. Singleton.

[3]  Ms. Douglas testified that "substantiated" means that "based upon the investigation that was conducted, it was found that the behavior or whatever action that they said occurred, based on the evidence we were able to find, that it did appear that that behavior did take place." (Doc. 29-18 at 6; 19:14–19).

promotable positions, a policy Mr. Lilley admitted to; and (5) Mr. Lilley made inappropriate comments of a sexual nature to and in the presence of several employees. (Doc. 29-7 at 9–10). Mr. Willis also concluded that two complaints of racially disparate treatment were either inconclusive or unsubstantiated. He determined the complaint that Mr. Lilley showed special treatment to white employees was inconclusive, explaining that he could not determine if the unfair treatment was aimed at any particular group. He found unsubstantiated a claim that a white employee left the department and then returned at the same salary, while two black employees left the department and then returned but were paid a lesser salary than when they left.

Mr. Lilley and Mr. Pierce received Mr. Willis' report on or about March 11, 2019. Mr. Lilley submitted a rebuttal to Mr. Pierce on March 14, 2019. On March 20, 2019, Mr. Pierce issued Mr. Lilley a written warning and required Mr. Lilley attend counseling with him biweekly for six months. Mr. Pierce also wrote a statement that, based on his review of Mr. Willis' report and Mr. Lilley's rebuttal, Mr. Lilley made inappropriate comments of a sexual nature in 2015. Mr. Pierce did not mention the other findings that Mr. Willis had substantiated.

On December 12, 2018, Mr. Thames, at Mr. Lilley's direction, disciplined Mr. Singleton for failing to keep his subordinates busy in contravention of his superior's orders. This discipline was triggered by a report from Mr. Rafferty, who claimed to have witnessed Mr. Singleton's crew standing around being unproductive for long periods. Mr. Singleton objected that the discipline was unfair because he was performing other tasks and could not be in two places at once. The next day, Mr. Thames, at Mr. Lilley's

direction, disciplined Mr. Singleton for "using derogatory language about th[e] department." (Doc. 29-4 at 7).   This discipline was triggered by a report from Mr. Rafferty, who claimed to have heard Mr. Singleton using derogatory language. Mr. Singleton went to Mr. Lilley, denied that he had used derogatory language, and presented statements from seven witnesses who all represented that they had not heard Mr. Singleton use any derogatory language on the day in question.  As a result, Mr. Lilley removed the disciplinary action from Mr. Singleton's file,[4] and it did not result in further discipline, loss of pay, or loss of benefits.

On May 8, 2019, Mr. Singleton applied for an open Garage Superintendent position in the Service Center to replace Mr. Lammon.  Mr. Rafferty also applied for the position.   The application contained a questionnaire that had not been part of prior applications for a Garage Superintendent position.   The questionnaire inquired about skills and experience in service writing and in the parts room.   Mr. Rafferty had previously served within Fleet as a service writer and as a parts room supervisor. Mr. Singleton contends that Mr. Lilley designed and implemented this new questionnaire.[5]   Additionally, Mr. Lilley assisted Mr. Rafferty in completing his application, but not Mr. Singleton.  Mr. Lilley's providing such assistance violates City

---

[4] Mr. Lilley insists this disciplinary action was never implemented; Mr. Singleton insists Mr. Lilley removed it from Mr. Singleton's file after he complained.  At summary judgment, the Court must view the evidence in the light most favorable to Mr. Singleton.

[5] Although the City argues there is no evidence that Mr. Lilley implemented the questionnaire, Ms. Douglas testified that the questionnaire more likely than not came from Mr. Lilley.  The Court will assume without deciding that there is sufficient evidence to create a factual dispute as to whether Mr. Lilley implemented the questionnaire, and the Court must view the evidence in the light most favorable to Mr. Singleton.

policy.   Among the qualified candidates for the position, Mr. Singleton was ranked seventh and Mr. Rafferty was ranked second.   According to Ms. Douglas, Mr. Lilley's assistance could have caused Mr. Rafferty to be ranked higher than he otherwise would have been.   Mr. Lilley selected Mr. Rafferty for the Garage Superintendent position on May 20, 2019,[6] and Mr. Rafferty assumed the role on or about May 31, 2019.   When Mr. Rafferty was hired as Garage Superintendent, he was a Parts Room Supervisor, which, as the title suggests, is a supervisory position.   Additionally, Mr. Rafferty had been working in Fleet for just under four years.

On May 23, 2019, Mr. Singleton was in a morning meeting with fellow supervisors, including Mr. Lammon and Mr. Rafferty.   At the beginning of the meeting, Mr. Lammon announced that Mr. Rafferty had been selected to replace Mr. Lammon as Garage Superintendent, and that Mr. Rafferty would be "filling in" for Mr. Lammon that week.   However, Mr. Singleton did not hear this announcement.   During the meeting, Mr. Rafferty made a comment to the effect of: "I am a great person to work for."   In response, Mr. Singleton made the sound "shhh" or "pshhh."   Mr. Rafferty directed Mr. Singleton to come and speak with him, but Mr. Singleton refused.    Mr. Lammon then asked Mr. Singleton to speak with Mr. Rafferty.    Mr. Singleton stated to Mr. Lammon, "Ronnie is not my boss."  Mr. Lammon then informed Mr. Singleton that Mr. Rafferty had been selected to replace Mr. Lammon and he (Mr. Singleton) should go

---

[6] The City contends that Mr. Lilley did not select Mr. Rafferty.  Mr. Lilley testified that a committee comprising superintendents, an "admin officer," and Mr. Lilley made the decision; but that Mr. Lilley only casts a vote in the event of a tie, and there is no evidence of a tie for this position.  However, Ms. Douglas testified that Mr. Lilley selected Mr. Rafferty.  At summary judgment, the Court must view the evidence in the light most favorable to Mr. Singleton.

talk to Mr. Rafferty.  Mr. Singleton complied.  Later that day, Mr. Rafferty wrote a memo to Mr. Lilley recommending that Mr. Singleton be suspended for being sarcastic, disrespectful, and insubordinate.  Mr. Lammon also recommended that Mr. Singleton be suspended.  Mr. Rafferty later admitted that he recommended the suspension because of "the past" and "multiple history" between him and Mr. Singleton.

In late May 2019, following the "sarcastic sound incident"[7] and Mr. Rafferty's recommending a suspension, Mr. Singleton made a report to Ms. Douglas about Mr. Lilley and Mr. Rafferty.  Ms. Douglas directed Mr. Singleton to speak with Mr. Pierce, which Mr. Singleton did.  The content of Mr. Singleton's report to Ms. Douglas is unclear from the record, except that, according to Mr. Pierce, Mr. Singleton complained to Ms. Douglas about "mistreatment" by Mr. Rafferty. Mr. Singleton complained to Mr. Pierce that Mr. Lilley and Mr. Rafferty were "targeting" him.  According to Mr. Pierce, Mr. Singleton also was upset that Mr. Rafferty got the Garage Superintendent promotion.  Mr. Singleton does not contend that he mentioned race when he complained to Ms. Douglas or Mr. Pierce, and Mr. Pierce does not recall Mr. Singleton mentioning or alluding to race.  Mr. Pierce investigated for approximately three days, during which time he spoke to Mr. Lilley and five of Mr. Singleton's coworkers.  All five of Mr. Singleton's coworkers told Mr. Pierce two things: (1) Mr. Singleton seemed unhappy and was unapproachable, and (2) Mr. Singleton was the best mechanic in Fleet.

---

[7] Mr. Singleton describes the events at the morning meeting as the "sarcastic sound incident," and thus the Court will also do so in this opinion.  In doing so, the Court does not necessarily adopt this characterization.

On June 3, 2019, Mr. Singleton attended a pre-disciplinary hearing with Mr. Lilley related to Mr. Rafferty's allegations that Mr. Singleton was disrespectful and insubordinate on May 23, 2019. Mr. Singleton recorded the hearing. Mr. Singleton responded to Mr. Rafferty's allegations, and he also presented Mr. Lilley a written rebuttal. On June 4, 2019, Mr. Singleton attended a meeting with Mr. Lilley and Mr. Pierce, in which Mr. Lilley relayed that he was issuing Mr. Singleton a letter of reprimand for his conduct towards Mr. Rafferty on May 23, 2019. Mr. Singleton also recorded this meeting. Mr. Lilley explained he had determined that, after speaking with Mr. Singleton and reading his rebuttal, Mr. Singleton was not aware when he made the sarcastic sound that Mr. Rafferty had been hired as Garage Superintendent to replace Mr. Lammon or that Mr. Rafferty was filling in for Mr. Lammon. Thus, Mr. Lilley concluded that Mr. Singleton was not intentionally being insubordinate, although Mr. Lilley concluded that Mr. Singleton's conduct nonetheless was disrespectful towards another employee. The City's employee handbook states that "[a]ll employees must be treated with respect." (Doc. 34-6 at 4). Accordingly, Mr. Lilley determined that a letter of reprimand rather than a suspension was appropriate discipline for Mr. Singleton's conduct. During the meeting, Mr. Pierce discussed his investigation into Mr. Singleton's complaint, including his interviews with five of Mr. Singleton's coworkers.

The letter of reprimand, which Mr. Lilley signed, states that Mr. Singleton was being disciplined for being insubordinate and disrespectful. Mr. Singleton submitted a rebuttal to Mr. Lilley objecting to the discipline, explaining that he could not be insubordinate to someone with whom he did not work in a subordinate capacity. (Doc.

29-4 at 23).  In response, Mr. Lilley told Mr. Singleton that, based on Mr. Singleton's admission that he made the sound towards Mr. Rafferty at the meeting, Mr. Lilley concluded that Mr. Singleton had been disrespectful and that disrespect was the reason for the letter of reprimand as much as insubordination. (*Id.* at 25).

The next day, on June 5, 2019, Mr. Rafferty disciplined Mr. Singleton for being thirty minutes late to work and failing to call ahead at least thirty minutes prior, which violates Fleet Management Operating Instructions and the City's employee handbook. Mr. Singleton admits that he was late and did not call ahead.  However, he contends it was because his father was sick that morning and needed him, which he relayed to Mr. Rafferty.

On July 26, 2019, while Mr. Singleton was busy working on an axle and brake assignment, which is part of his Master Mechanic duties, Mr. Rafferty ordered Mr. Singleton to stop what he was doing and go repair a vehicle air conditioner. According to Mr. Singleton, such repair work is beneath his skill level.  Additionally, there were idle white mechanics in the shop who could have performed the work. Mr. Singleton confronted Mr. Rafferty, asking why he was pulling Mr. Singleton away from his duties when there were other available mechanics around.  Mr. Rafferty responded, "Because I asked you to."  They continued to argue, and their conversation grew louder.  Mr. Rafferty then pointed his finger at Mr. Singleton.  At this point, Dallas Venable, another Superintendent who was present for the conversation, intervened and "ask[ed] them to stop before it g[ot] out of hand." (*Id.* at 27).  Mr. Venable advised Mr. Singleton that he should go do the work and "take it up with [Mr. Lilley]" later. (*Id.*).

12

Eventually Mr. Singleton complied and worked on the air conditioner.

On or about July 29, 2019, Mr. Lilley and Mr. Singleton met to discuss the incident with Mr. Rafferty that had occurred on July 26.   Mr. Lilley stated that Mr. Rafferty is Mr. Singleton's supervisor, and when his supervisor tells him to perform a task, the proper course of action is to first perform the task, even if he does not agree with it, and then discuss it with his supervisor later.   Mr. Lilley then explained that he had directed Mr. Rafferty to keep Mr. Singleton busy repairing equipment because Mr. Singleton had made comments in the past about not wanting to be a leader and only having one and a half years until he retires.   Mr. Lilley wrote in a memo dated July 29, 2019 that "[w]ith that attitude and the fact that [Mr. Singleton] has not shown any desire to lead as a master mechanic in the Service Center, he was assigned to the road to assist with the more complicated mechanical issues." (*Id.* at 29).   Mr. Singleton expressed to Mr. Lilley that he wanted to assume leadership and management responsibilities, and Mr. Lilley directed Mr. Rafferty and Mr. Singleton to create a list of job responsibilities for Mr. Singleton to achieve that end.

Later in the July 29, 2019 meeting, Mr. Singleton informed Mr. Lilley that two white mechanics, Jacob Adams and Robbie Clark, had been disrespectful to Mr. Rafferty during morning meetings but were not disciplined, even though Mr. Singleton had received a letter of reprimand for being disrespectful towards Mr. Rafferty at a morning meeting.   Mr. Lilley spoke to Mr. Rafferty, who confirmed Mr. Singleton's story; Mr. Rafferty stated that he did not discipline Mr. Adams or Mr. Clark because he believed they were joking.   Mr. Lilley issued Mr. Rafferty a letter of counseling regarding

consistent enforcement of City and Fleet rules regarding respect.  Mr. Lilley informed Mr. Rafferty that there could be a perception that Mr. Rafferty was selectively enforcing the rules and that his selective enforcement could be construed as discrimination "for taking action against a minority but letting majority members get away with it." (*Id.*). Mr. Lilley also directed Mr. Rafferty to counsel Mr. Adams and Mr. Clark, which Mr. Rafferty did.

On July 30, 2019, Mr. Singleton filed a complaint with the Equal Employment Opportunity Commission ("EEOC") claiming past and ongoing racial discrimination, harassment, retaliation, and hostile work environment conditions within Fleet. Mr. Singleton's counsel emailed a copy of the EEOC charge to Mr. Lilley and Mr. Pierce in the morning of July 31, 2019.

 On July 31, 2019, Mr. Rafferty, at Mr. Lilley's direction, implemented new job duties and responsibilities for Mr. Singleton, which Mr. Singleton refers to as the "Rob Singleton Rules."[8]  Mr. Rafferty required Mr. Singleton to sign an agreement outlining these rules.  The agreement states: "Because the Service Center has not had a Master Mechanic performing master mechanic duties in the past, this list will serve as the operational as well as the administrative responsibilities for this position." (*Id.* at 31).  It is undisputed that these rules had never been applied to another Master Mechanic in Fleet. Mr. Rafferty admits that Mr. Singleton did not have a choice in signing the agreement. The "Rob Singleton Rules" required, among other things, that Mr. Singleton meet with

---

[8] Because Mr. Singleton refers to them as the "Rob Singleton Rules," the Court will also do so in this opinion.  In doing so, the Court does not necessarily adopt this characterization.

Mr. Rafferty every morning at 7:15 a.m. and every afternoon at 2:45 p.m.  The rules also require Mr. Singleton to serve as needed on the "road crew," which comprises the duties of entry-level mechanics.

On August 2, 2019, two days after the implementation of the "Rob Singleton Rules," Mr. Raffety issued Mr. Singleton a verbal counseling for missing their morning meeting mandated by those rules.   On August 13, 2019, Mr. Rafferty issued Mr. Singleton a letter of counseling because Mr. Singleton missed two meetings with Mr. Rafferty: one in the afternoon of August 12, and one in the morning of August 13.[9] On August 12, at 2:45 p.m., Mr. Singleton had recently returned from a road call at Mr. Rafferty's direction.  Mr. Singleton was speaking with other employees in Fleet about the road call  repairs and "los[t] track of time." (*Id.* at 33).    On August 13, Mr. Singleton returned from a road call near the time he was to have his 7:15 a.m. meeting with Mr. Rafferty.  Mr. Singleton was helping another mechanic put a heavy cylinder on a truck because one of the mechanics was unavailable and the job required two people. Mr. Singleton objected to the discipline issued on August 13, 2019.  Mr. Singleton stated to Mr. Rafferty, "What y'all fail to understand is when a mechanic is in the middle of fixing something, you can't just stop what you are doing and make a phone call." (*Id.*). Mr. Rafferty acknowledged that Mr. Singleton did not fail to meet with him as an act of insubordination and that Mr. Singleton was likely just busy.

---

[9] Mr. Singleton asserts that Mr. Lilley directed Mr. Rafferty to discipline Mr. Singleton as often as possible under the "Rob Singleton Rules."   However, Mr. Singleton fails to identify evidence to support this assertion.

On or about September 5, 2019, Mr. Rafferty conducted Mr. Singleton's annual performance evaluation.  Mr. Rafferty indicated that Mr. Singleton was ineligible for a merits-based pay raise that year because Mr. Singleton had incurred four disciplinary infractions in the rating year: (1) the June 4, 2019 letter of reprimand for the sarcastic sound incident; (2) the June 5, 2019 discipline for being late to work; (3) the August 2, 2019 verbal counseling for missing a meeting with Mr. Rafferty; and (4) the August 13, 2019 written counseling for missing two meetings with Mr. Rafferty.  The City's employee handbook states that employees are ineligible for a merits-based pay raise if they incur three or more disciplinary infractions in the rating year.

On January 15, 2020, Mr. Singleton was suspended for three days for missing work. Mr. Singleton believed he was approved to be off for vacation over the end-of-year holidays, but he got the days wrong.  Ultimately, at the January 15, 2020 disciplinary hearing, Mr. Singleton accepted responsibility for his error and the resulting three-day suspension.

Mr. Singleton applied for two open Garage Superintendent positions in 2020.  The questionnaire from the May 2019 application was not part of the applications for the 2020 positions.  On or about April 8, 2020, Mr. Lilley selected Rahmel Howard, an African-American, to fill an open Garage Superintendent position within Fleet. Mr. Singleton was not ranked as one of the top five candidates and thus was not interviewed for the position.  On May 14, 2020, Mr. Singleton applied for a Garage Superintendent position in the Petroleum Division within Fleet.  He was ranked first on

the list of candidates.[10]   Toney Smith, who was ranked fifth on the list of candidates,[11] was selected.  Toney Smith is African-American.

On August 6, 2020, the EEOC issued Mr. Singleton a "right to sue" letter. Mr. Singleton filed a Complaint in this Court on November 4, 2020.

## V.  DISCUSSION

Absent direct evidence of race discrimination or retaliation, a plaintiff may demonstrate circumstance evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).   Because Mr. Singleton has not offered any direct evidence of discrimination or retaliation, the Court addresses his claims under the *McDonnell Douglas* framework applicable to circumstances evidence of discrimination. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).   Under this framework, an employee creates a presumption of unlawful discrimination by first establishing a prima facie case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*").   The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253).   If the employer articulates a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the

---

[10] Mr. Singleton was tied for first with three other candidates.

[11] Mr. Smith was tied for fifth with two other candidates.

employer's proffered reason is pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).

The *McDonnell Douglas* framework, however, is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (footnote omitted) (citation omitted). A plaintiff may establish a "convincing mosaic" with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citations omitted) ("*Lewis II*").

## A. Race Discrimination

Mr. Singleton argues that he was discriminated against based on his race when he received various disciplinary infractions between August 2018 and January 2020; when the City failed to promote him to a Garage Superintendent position in May 2019; when, on or about July 26, 2019, his then-supervisor Mr. Rafferty interrupted his work and ordered him to perform a different task; and when Mr. Lilley and Mr. Rafferty imposed on him new job rules and Mr. Rafferty subsequently disciplined him for violating those rules, which caused him to be ineligible for an annual merits-based pay raise. Mr. Singleton contends that his

claim survives summary judgment when analyzed under the traditional *McDonnell Douglas* framework, or alternatively that he can establish a "convincing mosaic" of circumstantial evidence.  In his sur-reply brief, Mr. Singleton also argues that he can prevail based on a mixed motive theory under *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016).[12]  The Court will address each argument in turn.

### 1.  *McDonnell Douglas*

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Mr. Singleton must show: (1) he belongs to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to perform the job in question, and (4) his employer treated "similarly situated" employees outside his protected class more favorably. *Lewis I*, 918 F.3d at 1220–21.  To prove an adverse employment action, Singleton must show "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original), *overruled in part on other grounds by Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006).

---

[12] "An employee can succeed on a mixed-motive claim by showing that illegal bias . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* at 1235 (quoting 42 U.S.C. § 2000e-2(m)).  When examining a mixed-motive claim at summary judgment, courts "ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'" *Id.* at 1239 (alteration in original) (emphasis in original) (citation omitted).

It is undisputed that Mr. Singleton belongs to a protected class and that he was qualified[13] for the Garage Superintendent position.  The City argues that Mr. Singleton nonetheless cannot establish a prima facie case of race discrimination.  While it is undisputed that the City's failure to promote him is an adverse employment action, the City argues that the remaining incidents of allegedly disparate treatment are not.  The City also argues that Mr. Singleton fails to identify a similarly situated employee outside his protected class who was treated more favorably.  The Court will address the allegedly adverse employment actions to which Mr. Singleton was subjected in chronological order.

### a.  2018 Disciplinary Actions

Mr. Singleton contends that he was discriminated against based on his race when he was disciplined on three occasions in 2018: (1) on August 10, 2018, when Mr. Lilley directed Mr. Lammon to discipline Mr. Singleton based on the perception that Mr. Singleton was using his work cell phone for personal reasons; (2) on December 12, 2018, when Mr. Lilley directed Mr. Thames to discipline Mr. Singleton for failing to keep his crew busy; and (3) on December 13, 2018, when Mr. Lilley directed Mr. Thames to

---

[13] While the City contends in its discussion of the prima facie case that Mr. Singleton was ineligible to be selected for the position because he was not one of the top five candidates certified by the Board, the City does not expressly argue that Mr. Singleton was not qualified for purposes of satisfying his prima facie case.  To the extent the City argues that Mr. Singleton was not qualified, the Court finds the argument unavailing.  It is undisputed that the Board determined Mr. Singleton was qualified.  It is also undisputed that, to be on the certified list of eligible candidates, an employee must rank as one of the top five qualified candidates.  Thus, eligibility for a position is one step removed from being qualified for the position.  An employee could be qualified and nonetheless ineligible because five (or more) other employees were also qualified and ranked higher by the Board.  While eligibility is relevant to other aspects of the Court's analysis, it is not dispositive as to whether Mr. Singleton was qualified.

discipline Mr. Singleton for using derogatory language about the department.[14] Mr. Singleton cannot make out a prima facie case because he produces insufficient evidence that any of the three disciplinary actions was an adverse employment action. They did not cause a serious and material change in the terms, conditions, or privileges of employment because they did not result in further discipline, a loss of pay or benefits, or any other tangible consequence. *See Davis*, 245 F.3d at 1240 (holding that negative job performance memo in employee's file was not adverse employment action because memo did not result in any "tangible consequence . . . in the form of loss of pay or benefits or further discipline"). Both the August and December 13 disciplinary actions were later removed from Mr. Singleton's personnel file, and the December 12 written counseling is merely a letter in his file. *See id.* Thus, they did not cause a serious and material change in the terms, conditions, or privileges of Mr. Singleton's employment. Therefore, Mr. Singleton cannot satisfy his prima facie case with respect to the August 10, December 12, or December 13 disciplinary actions.

### b.  May 2019 Denial of Garage Superintendent Promotion

Mr. Singleton also argues that he was discriminated against based on his race when the City failed to promote him to a Garage Superintendent position in May 2019. The City

---

[14] Mr. Singleton filed his EEOC charge on July 30, 2019, more than 180 days after each of the 2018 disciplinary infractions. Thus, the Court doubts that the EEOC charge was timely with respect to the 2018 disciplines. However, because the City does not argue that the claims are time-barred, the Court will address them on the merits.

argues that Mr. Singleton cannot satisfy his prima facie case[15] because his proffered comparator, Mr. Rafferty, is not similarly situated.   When a plaintiff proceeds under *McDonnell Douglas*, the proffered comparator must be similarly situated to the plaintiff "in all material respects." *Lewis I*, 918 F.3d at 1226.   Mr. Singleton contends that Mr. Rafferty, a white employee who was promoted to the Garage Superintendent position in May 2019, is a proper comparator.   The City argues that Mr. Singleton and Mr. Rafferty are not similarly situated in all material respects because Mr. Rafferty was certified by the Board as one of the top five candidates for the position and thus was eligible for the promotion, whereas Mr. Singleton was ranked seventh and thus was not eligible. Mr. Singleton counters that Mr. Rafferty is similarly situated, although Mr. Singleton does not clearly articulate why this is so: in his response in opposition to summary judgment, Mr. Singleton incorporates by reference the facts and arguments in earlier sections of his brief and "adds that based on the foregoing, Ronnie Rafferty is similarly situated to Mr. Singleton for purposed [sic] of his racial discrimination claims." (Doc. 29 at 28). Mr. Singleton does not respond to the City's argument as to why he and Mr. Rafferty are not similarly situated, and he does not cite any authority or cite with specificity any evidence in support of his argument that they are similarly situated.   Accordingly, the Court concludes that Mr. Singleton has failed to show that a similarly situated employee outside

---

[15] The City also argues that Mr. Singleton cannot satisfy his prima facie case because Mr. Lilley, the person allegedly harboring discriminatory animus, did not select Mr. Rafferty for the promotion.  However, as explained *supra* note 6, there is a factual dispute as to whether Mr. Lilley, the allegedly discriminatory decisionmaker, selected Mr. Rafferty for the Garage Superintendent position, and in resolving the City's motion for summary judgment, the Court views the evidence in the light most favorable to Mr. Singleton.

his protected class was treated more favorably, and thus he has failed to establish a prima facie case with respect to his failure to promote claim.

Assuming, *arguendo*, that Mr. Singleton had satisfied his prima facie case, the burden would shift back to the City "to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis I*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253). The burden at this stage is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.* In its opening brief, the City argued only that Mr. Singleton could not satisfy his prima facie case; it did not expressly set forth any legitimate, nondiscriminatory reasons for not promoting Mr. Singleton. However, in his response in opposition, Mr. Singleton argues that the City's reasons for not promoting Mr. Singleton are pretextual. It appears to the Court that Mr. Singleton has construed the City's arguments for why Mr. Singleton and Mr. Rafferty are not similarly situated—that Mr. Rafferty was eligible for the promotion and Mr. Singleton was not—as the City's proffered legitimate, nondiscriminatory reason for not promoting Mr. Singleton. To the extent that the City argued that it did not promote Mr. Singleton in May 2019 because he was ranked seventh and thus not eligible for the promotion, the Court will assume without deciding that this explanation satisfies the City's burden of production.

Once the employer articulates a legitimate, nondiscriminatory reason for its decision, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason[] [is] a pretext for discrimination." *Alvarez*, 610 F.3d at 1264. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence,'" *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256), such that a rational trier of fact could disbelieve the employer's proffered nondiscriminatory reason, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). The City did not argue that Mr. Singleton could not show pretext. Nonetheless, since Mr. Singleton argued that the City's reasons for not promoting him were pretextual, the Court will address pretext on the merits.

Mr. Singleton argues that the City's legitimate, nondiscriminatory reason for not promoting him in May 2019 is a pretext because Mr. Lilley "rigged" the application process in Mr. Rafferty's favor in two ways. First, Mr. Singleton contends that Mr. Lilley changed the May 2019 Garage Superintendent application to guarantee that Mr. Rafferty would be eligible for and ultimately selected for the position. Specifically, Mr. Singleton contends that Mr. Lilley designed and implemented a new questionnaire that had not been part of prior applications for a Garage Superintendent position and were not part of subsequent applications; and that this questionnaire inquired about skills and experience that Mr. Rafferty uniquely possessed, specifically skills in service writing and as a supervisor in the parts room. Second, Mr. Singleton contends that Mr. Lilley assisted Mr. Rafferty with his application in violation of City policy, and that because of Mr. Lilley's assistance, Mr. Rafferty was ranked higher than he otherwise would have been.

The above questionnaire was not part of the 2018 Garage Superintendent application or either of the 2020 Garage Superintendent applications. Additionally, it is undisputed

that Mr. Rafferty had prior experience as a service writer and as a supervisor in the parts room.  Finally, it is undisputed that Mr. Lilley helped Mr. Rafferty with his application, which violates City policy.  Viewing the facts in the light most favorable to Mr. Singleton, a reasonable jury could conclude that (1) Mr. Lilley manipulated the May 2019 Superintendent application process to guarantee or improve Mr. Rafferty's chances of being ranked in the top five and thus eligible for selection; and (2) Mr. Lilley then selected Mr. Rafferty from the pool of eligible candidates.  However, Mr. Singleton produces insufficient evidence from which a reasonable jury could conclude that Mr. Lilley's actions were based on race.  Mr. Singleton's contention or subjective belief that race motivated the actions is insufficient.  While Mr. Lilley's actions reek of favoritism, which is an "unseemly and regrettable . . . basis for employment decisions in most contexts," favoritism as such does not constitute discrimination under Title VII. *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990) (upholding judgment for employer in sex discrimination case where the owner's son was perceived to be having an affair with the female plaintiff and the owner fired the plaintiff but not his son).  Moreover, Mr. Singleton does not argue that either service writer or parts room experience is an irrelevant skill for a potential Garage Superintendent.  The Court does not suggest that Mr. Singleton would necessarily demonstrate pretext if he had shown that those skills were irrelevant.  However, on this record, the failure to demonstrate (or even argue) that those skills were irrelevant further undermines his position that Mr. Lilley's actions in favoring Mr. Rafferty were based on unlawful race discrimination.  To the extent that Mr. Singleton argues that the City's proffered reasons for not promoting him are pretextual because he is

more qualified than Mr. Rafferty, Mr. Singleton has failed to demonstrate that the disparities between Mr. Rafferty's qualifications and his own were so great that no reasonable person could have chosen Mr. Rafferty over him. *See Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam).

Additionally, it is undisputed that two of the top five candidates for the May 2019 Garage Superintendent position were African-American (Rahmel Howard and Toney Smith), which further undermines Mr. Singleton's position that Mr. Lilley's implementing the questionnaire and helping Rafferty with his application were based on unlawful race discrimination. It is also undisputed that, in 2018 and 2020, the City filled a total of three Garage Superintendent positions with an African-American employee. The Court does not suggest that a plaintiff's failure to promote claim is necessarily doomed where the employer has on another occasion promoted an employee with the plaintiff's protected characteristic. However, under the facts of this case and the lack of any evidence that Mr. Lilley's actions were based on race, the fact that other African-American employees were selected as Garage Superintendents in 2018 and 2020 bolsters the Court's conclusion that no reasonable jury could infer intentional race discrimination based on the selection of Mr. Rafferty in May 2019.

Assuming, *arguendo*, that Mr. Singleton had produced sufficient evidence that Mr. Lilley's actions were based on race, which he has not, Mr. Singleton has nonetheless failed to produce evidence that Mr. Lilley's actions materially impacted the outcome of the rankings. Recall the undisputed fact that a member of the Board—not Mr. Lilley—ranked the applicants. Although Ms. Douglas testified that it was possible Mr. Lilley's help had

caused Mr. Rafferty to be ranked higher, she did not testify about the extent to which Mr. Lilley's help may have impacted the rankings.  Given the undisputed facts that Mr. Rafferty was ranked second and Mr. Singleton was ranked seventh, it is merely speculative, based on this record, that but for Mr. Lilley helping Mr. Rafferty with his application, Mr. Singleton would have been ranked within the top five candidates and Mr. Rafferty would not have.  Even assuming that Mr. Lilley's help catapulted Mr. Rafferty from outside the top five all the way to second, the undisputed fact remains that another employee was ranked higher than Mr. Singleton.  So even if Mr. Rafferty were removed from the top five, Mr. Singleton would still be ranked below someone else—and outside the top five.  Thus, removing Mr. Rafferty from the top five is insufficient to permit the inference that Mr. Singleton would have been within the top five and thus eligible to be interviewed.

In conclusion, Mr. Singleton has failed to demonstrate that a discriminatory reason more likely motivated the City or that the City's proffered explanation for not promoting him is unworthy of credence. *See Kragor*, 702 F.3d at 1308.  Thus, Mr. Singleton has failed to show that the City's reason for promoting Mr. Rafferty over him in May 2019 was a pretext for race discrimination.

### c.  June 4, 2019 Disciplinary Action

Mr. Singleton next contends that he was discriminated against based on his race on June 4, 2019 when he was issued a letter of reprimand for making a "sarcastic sound" directed at Mr. Rafferty at a morning meeting.  The letter of reprimand is an adverse employment action because it, in combination with other disciplinary actions, resulted in

Mr. Singleton being denied a merits-based raise in September 2019. *Cf. Davis*, 245 F.3d at 1240.  The City contends that Mr. Singleton nonetheless cannot satisfy his prima facie case because he cannot show that a similarly situated employee outside his protected class was treated more favorably.  Mr. Singleton suggests that two white mechanics, Jacob Adams and Robbie Clark, are proper comparators because they were disrespectful towards Mr. Rafferty during morning meetings, but Mr. Rafferty did not discipline either of them because he believed they were joking.  It is undisputed, however, that when Mr. Singleton complained to Mr. Lilley about this perceived disparate treatment, Mr. Lilley disciplined Mr. Rafferty for being inconsistent in his enforcement of City policy and also directed Mr. Rafferty to discipline Mr. Adams and Mr. Clark, which Mr. Rafferty did.  Ultimately, and particularly as it relates to the *employer's* liability, Mr. Singleton, Mr. Adams, and Mr. Clark were treated similarly based on similar rule violations.[16]  Therefore, Mr. Singleton has failed to produce evidence sufficient to create a genuine dispute of material fact as to whether the City treated similarly situated employees outside Mr. Singleton's protected class more favorably.  Accordingly, Mr. Singleton cannot satisfy his prima facie case with respect to the June 4, 2019 letter of reprimand.

Assuming, *arguendo*, that Mr. Singleton had been able to establish a prima facie case of discrimination, the burden of production would then shift to the City to articulate a legitimate, nondiscriminatory reason for disciplining him for the "sarcastic sound"

---

[16] Assuming that a reasonable jury could infer that Mr. Rafferty harbored a racially discriminatory motive based on his disparate treatment of Mr. Singleton compared to Mr. Jacobs and Mr. Clark, Mr. Rafferty's motive is not a basis for holding the City liable on this record because Mr. Rafferty was not the final decisionmaker and someone higher in the chain of command ultimately made sure that Mr. Jacobs and Mr. Clark *were* disciplined.

incident.  The City contends that it disciplined Mr. Singleton because his behavior was insubordinate and disrespectful in violation of Fleet Operating Instructions and City policy. This explanation satisfies the City's burden.

Even if Mr. Singleton had satisfied his prima facie case, he has nonetheless failed to produce sufficient evidence of pretext to survive summary judgment on this claim.  The City argues that Mr. Singleton cannot show pretext because he admitted that he made the sarcastic sound, which was disrespectful even if not insubordinate, and no similarly situated employee outside his protected class was treated more favorably.  In the Eleventh Circuit, a "'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1363 (11th Cir. 1999).  The Court notes that Mr. Singleton did not expressly advance a pretext argument with respect to the sarcastic sound incident in either his response in opposition or in his sur-reply.  Nonetheless, the Court has reviewed the evidentiary record, including the recordings of the meetings surrounding Mr. Singleton's discipline for this incident, and the Court concludes that Mr. Singleton has failed to produce sufficient evidence of pretext.

Mr. Singleton admits that he made the purportedly sarcastic sound.  He quarrels with the City's explanation that Mr. Singleton was disciplined for being "insubordinate" because, at the time of the morning meeting, Mr. Rafferty had not officially assumed the role of Superintendent, and Mr. Singleton did not hear Mr. Lammon's announcement at the beginning of the meeting that Mr. Rafferty was filling in for Mr. Lammon.  When

Mr. Singleton explained this to Mr. Lilley after receiving the letter of reprimand, Mr. Lilley responded that, based on Mr. Singleton's admission that he made the sound towards Mr. Rafferty at the meeting, Mr. Lilley concluded that Mr. Singleton had been disrespectful and that disrespect was the reason for the letter of reprimand as much as the insubordination charge. (Doc. 29-4 at 25).   The City's employee handbook states that "[a]ll employees must be treated with respect." (Doc. 34-6 at 4).   Mr. Singleton does not dispute that his action was disrespectful or that disrespect is a rule violation.   Thus, Mr. Singleton has failed to rebut each of the City's legitimate, nondiscriminatory reasons for disciplining him on June 4, 2019. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").   Additionally, as explained above, Mr. Singleton cannot show that employees outside his protected class engaged in similar acts but were not disciplined. *See Damon*, 196 F.3d at 1363.   Finally, Mr. Lilley, after listening to Mr. Singleton's side of the story, imposed a lesser punishment than the suspension recommended by both Mr. Rafferty and Mr. Lammon.   This fact further undermines Mr. Singleton's position that Mr. Lilley acted out of racially discriminatory animus.   Therefore, Mr. Singleton has failed to show that the City's reasons for disciplining him on June 4, 2019 were pretext for race discrimination.

### d.  June 5, 2019 Disciplinary Action

Mr. Singleton also argues that he was discriminated against based on his race on June 5, 2019, when Mr. Rafferty disciplined him for being thirty minutes late to work and failing to call ahead at least thirty minutes.  This discipline is an adverse employment action

because it, in combination with others, resulted in Mr. Singleton being denied a merits-based raise in September 2019. *Cf. Davis*, 245 F.3d at 1240.  Nonetheless, Mr. Singleton cannot satisfy his prima facie case because he produces insufficient evidence that a similarly situated employee outside his protected class was treated more favorably, i.e., that such employee was late and failed to call ahead but was not disciplined.

Assuming, *arguendo*, that Mr. Singleton had been able to satisfy his prima facie case, the burden of production would then shift to the City to articulate a legitimate, nondiscriminatory reason for its decision.  The City contends that Mr. Rafferty disciplined Mr. Singleton because he was thirty minutes late to work and did not call at least thirty minutes prior to work that he would be late, which violates Fleet Management Operating Instructions and the City's employee handbook.  This explanation satisfies the City's burden.

Even if he had satisfied his prima facie case, Mr. Singleton has nonetheless failed to produce sufficient evidence of pretext to survive summary judgment on this claim.  The City argues that Mr. Singleton cannot show pretext because he admitted that he was late and failed to call ahead, and no similarly situated employee outside his protected class was treated more favorably.  The Court notes that Mr. Singleton did not expressly advance a pretext argument with respect to the June 5, 2019 discipline in either his response in opposition or in his sur-reply.  Nonetheless, the Court has reviewed the evidentiary record and concludes that Mr. Singleton has failed to produce sufficient evidence of pretext. Mr. Singleton admits that he was late to work and did not call at least thirty minutes prior. Although he contends that the discipline was unfair because he was caring for his sick

father and thus was unable to report to work on time, courts evaluating Title VII claims are not in the "business of adjudging whether employment decisions are prudent or fair." *See Damon*, 196 F.3d at 1361. Rather, courts are concerned with "whether unlawful discriminatory animus motivate[d] a challenged employment decision." *Id.* Mr. Singleton fails to produce sufficient evidence that racially discriminatory animus motivated the June 5, 2019 disciplinary decision. Additionally, as explained above, Mr. Singleton has not identified a similarly situated employee outside his protected class who engaged in a similar act but was not disciplined. *See id.* at 1363. Thus, Mr. Singleton has failed to show that the City's proffered reasons for disciplining him on June 5, 2019 were pretext for race discrimination.

### e.  July 2019 Task Reassignment

Mr. Singleton also contends that he was discriminated against based on his race when, on or about July 26, 2019, Mr. Rafferty interrupted his work and ordered him to work on a vehicle air conditioner, a task Mr. Singleton contends is beneath his skill level, even though idle white mechanics were also present who could have performed the work. Mr. Singleton fails to satisfy his prima facie case because this one-time task reassignment is not an adverse employment action. *See Davis*, 245 F.3d at 1239 (explaining that, for purposes of a Title VII discrimination claim, an adverse employment action is a "serious and material change in the terms, conditions, or privileges of employment" (emphasis omitted)). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* On this record, the task

reassignment Mr. Singleton complains of is not an adverse employment action because it is not a serious and material change in the terms, conditions, or privileges of employment for Mr. Singleton, on one occasion, to have to stop working on a task and go perform a different task, even if the different task was beneath his skill level. A reasonable person under the circumstances would not view this action as materially adverse. Therefore, Mr. Singleton cannot satisfy his prima facie case with respect to the July 2019 task reassignment.

### f.   July 31, 2019 Implementation of "Rob Singleton Rules"

Mr. Singleton also argues that he was discriminated against based on his race on July 31, 2019, when Mr. Rafferty, at Mr. Lilley's direction, implemented job rules and responsibilities that applied only to Mr. Singleton. He argues that the implementation of the "Rob Singleton Rules" was an adverse employment action because the rules altered Mr. Singleton's employment status in the following ways: they required Singleton to work on the road crew, which comprises the duties of entry-level mechanics; they stripped Mr. Singleton of his supervisory responsibilities; and they required Mr. Singleton to meet with Mr. Rafferty twice daily. The Court will assume without deciding that this was an adverse employment action. However, Mr. Singleton fails to produce evidence that a similarly situated employee outside his protected class was treated more favorably. The Court acknowledges that these rules were unique to Mr. Singleton because there had never been a Master Mechanic in the Service Center. However, the Court is not convinced that Mr. Singleton's unique situation excuses his failure to provide a comparator for purposes of satisfying his prima facie case under the *McDonnell Douglas* framework. Thus,

Mr. Singleton cannot satisfy his prima facie case with respect to the implementation of the "Rob Singleton Rules."

Assuming, *arguendo*, that Mr. Singleton had been able to satisfy his prima facie case, the burden would then shift to the City to articulate a legitimate, nondiscriminatory reason for its actions. The City offers the following reasons for implementing these rules: (1) the City had never before had a Master Mechanic in the Service Center and wanted to clarify the responsibilities for the position; and (2) Mr. Singleton expressed to Mr. Lilley in the July 29, 2019 meeting that he wanted more leadership responsibilities, and Mr. Lilley directed Mr. Rafferty and Mr. Singleton to create a list of rules and responsibilities to achieve that end. These explanations satisfy the City's burden.

Even if he had satisfied his prima facie case, Mr. Singleton fails to present evidence sufficient to create a genuine issue of material fact as to whether the City's reasons for implementing the "Rob Singleton Rules" were pretextual. Mr. Singleton does not dispute that he was the first Master Mechanic in the Service Center or that he expressed to Mr. Lilley that he wanted to take on more leadership responsibilities. Mr. Singleton nonetheless contends that Mr. Lilley set him up for failure by forcing him to sign an agreement to which he contends strict adherence is impossible given the volume of work in Fleet. Mr. Singleton also contends that Mr. Lilley's true motive was to "punish" Mr. Singleton for a perceived poor "attitude." Even accepting Mr. Singleton's position as true, that Mr. Lilley "set him up for failure" or wished to punish him for a poor "attitude" by itself does not permit the inference that Mr. Lilley acted out of racially discriminatory animus. Mr. Singleton also argues that the rules were a pretext to permit new ways for

34

Mr. Rafferty to discipline him and negatively impact his future raises and promotion opportunities.  Given the workplace history between Mr. Rafferty and Mr. Singleton— including Mr. Rafferty "ratting out" Mr. Singleton to Mr. Singleton's supervisors in 2018; Mr. Rafferty recommending that Mr. Singleton be suspended for making a "sarcastic sound" in response to something Mr. Rafferty said in a meeting, which recommendation Mr. Rafferty later admitted was because of "the past" and "multiple history" between the two of them; Mr. Rafferty disciplining Mr. Singleton after Mr. Singleton was thirty minutes late to work; and the July 26, 2019 incident regarding the air conditioner repair—a reasonable jury could conclude that Mr. Rafferty had personal animosity towards Mr. Singleton, and perhaps that Mr. Rafferty relished the opportunity to punish Mr. Singleton whenever he could.  But "[p]ersonal animosity is not the equivalent of [race] discrimination and is not proscribed by Title VII." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986).  Mr. Singleton produces insufficient evidence from which a reasonable jury could infer that Mr. Lilley's or Mr. Rafferty's actions were based on Mr. Singleton's race.  Mr. Singleton's contention or subjective belief that race motivated the actions is insufficient.  Thus, Mr. Singleton has failed to show that the City's proffered reasons for implementing the "Rob Singleton Rules" were pretext for race discrimination.

### g.  August 2, 2019 and August 13, 2019 Disciplinary Actions

Mr. Singleton also argues that he was discriminated against based on his race when, on August 2, 2019 and August 13, 2019, Mr. Rafferty disciplined him for missing meetings with Mr. Rafferty—meetings required by the "Rob Singleton Rules."  These disciplinary actions are adverse employment actions because they, in combination with others, resulted

in Mr. Singleton being denied a merits-based raise in September 2019. *Cf. Davis*, 245 F.3d at 1240. However, Mr. Singleton fails to produce evidence that a similarly situated employee outside his protected class was treated more favorably. The Court acknowledges that the rules Mr. Singleton was disciplined for violating were unique to him. However, the Court is not convinced that Mr. Singleton's unique situation excuses his failure to provide a comparator for purposes of satisfying his prima facie case under the *McDonnell Douglas* framework. Thus, Mr. Singleton cannot satisfy his prima facie case with respect to the August 2, 2019 and August 13, 2019 disciplinary actions.

Assuming, *arguendo*, that Mr. Singleton had been able to satisfy his prima facie case, the burden would then shift to the City to articulate a legitimate, nondiscriminatory reason for its actions. The City contends that Mr. Rafferty disciplined Mr. Singleton on August 2, 2019, because Mr. Singleton missed a scheduled meeting that day; and that Mr. Rafferty disciplined Mr. Singleton on August 13, 2019, because Mr. Singleton missed a scheduled meeting on August 12 and another scheduled meeting on August 13. These explanations satisfy the City's burden.

Even if he had satisfied his prima facie case, Mr. Singleton has failed to produce sufficient evidence of pretext to survive summary judgment on this claim. The Court notes that Mr. Singleton did not expressly advance a pretext argument with respect to the August 2019 disciplinary actions in either his response in opposition or in his sur-reply. Nonetheless, the Court has reviewed the evidentiary record and concludes that Mr. Singleton has failed to produce sufficient evidence of pretext. Mr. Singleton admits that he missed meetings with Rafferty on August 2, August 12, and August 13.

Nonetheless, Mr. Singleton contends that the August 13 discipline was unfair because he was busy working when he missed the August 12 and 13 meetings.   Mr. Rafferty acknowledged that Mr. Singleton did not miss the meetings as acts of subordination and instead Singleton was likely just busy.   But unfair treatment alone does not violate Title VII: there must be evidence that the treatment was based upon unlawful discriminatory animus. *See Damon*, 196 F.3d at 1361.   And Mr. Singleton has produced insufficient evidence from which a reasonable jury could conclude that Mr. Rafferty's actions were based on Mr. Singleton's race.   Additionally, as explained above, Mr. Singleton has not identified a similarly situated employee outside his protected class who engaged in a similar act but was not disciplined. *See id.* at 1363.   Thus, Mr. Singleton has failed to show that the City's proffered reasons for disciplining him on August 2, 2019 or August 13, 2019 were pretext for race discrimination.

### h.  January 2020 Suspension

Mr. Singleton also argues that he was discriminated against based on his race when he was suspended without pay for three days in January 2020 for missing work.  The City argues that the Court should not consider the January 2020 suspension because Mr. Singleton did not allege it in his Complaint.   Even if it could be read into in his Complaint, Mr. Singleton cannot satisfy his prima facie case because he produces insufficient evidence that a similarly situated employee outside his protected class was disciplined less harshly for the same misconduct.

Assuming, *arguendo*, that Mr. Singleton had been able to satisfy his prima facie case, the burden of production would then shift to the City to articulate a legitimate,

nondiscriminatory reason for its decision.  The City contends that it suspended Mr. Singleton because he failed to show up for work for three days, which is a violation of City policy.  This explanation satisfies the City's burden.

Even if Mr. Singleton had been able to make out a prima facie case, he nonetheless fails to demonstrate that the City's proffered legitimate, nondiscriminatory reason for suspending him was pretextual.  The City argues that Mr. Singleton cannot show pretext because he admitted that he missed work on those days, and no similarly situated employee outside his protected class was treated more favorably.  The Court notes that Mr. Singleton did not expressly advance a pretext argument with respect to the January 2020 suspension in either his response in opposition or in his sur-reply.  Nonetheless, the Court has reviewed the evidentiary record and concludes that Mr. Singleton has failed to produce sufficient evidence of pretext.  Mr. Singleton admits that he missed work on these days but contends that he mixed up his vacation days.  However, Mr. Singleton's position falls short of demonstrating that the City's proffered reason is unworthy of credence or that a discriminatory reason more likely motivated the City. *See Kragor*, 702 F.3d at 1308.  And as explained above, Mr. Singleton fails to produce evidence that a similarly situated employee outside his protected class was disciplined less harshly for similar misconduct. Therefore, Mr. Singleton has failed to show that the City's proffered reason for suspending him was a pretext for unlawful race discrimination.

### 2.  Convincing Mosaic

Mr. Singleton argues in the alternative that, even if he cannot prevail under the *McDonnell Douglas* burden-shifting framework, his race discrimination claim nonetheless

survives summary judgment because he has established a convincing mosaic of circumstantial evidence of intentional discrimination.   Mr. Singleton contends that a "plethora of facts and circumstances satisfy the convincing mosaic theory," and in particular emphasizes "[t]he timing of Mr. Lilley's disciplinary action taken against Mr. Singleton; Lilley's his [sic] double-minded assertions as to why he changed Mr. Singleton's employment status," which the Court presumes is a reference to the "Rob Singleton Rules," and "[Mr. Lilley's] exceedingly favorable treatment of Ronnie Rafferty." (Doc. 29 at 30).

The Court begins with the City's failure to promote Mr. Singleton to Garage Superintendent in May 2019.  Accepting as true that Mr. Lilley intentionally rigged the application process in favor of Mr. Rafferty and then personally selected Mr. Rafferty, Mr. Singleton fails to produce evidence showing that Mr. Lilley's actions were based upon unlawful race discrimination as opposed to favoritism.   Regarding the "timing of Mr. Lilley's disciplinary action taken against" him, Mr. Singleton fails to specify the disciplinary action(s) to which he refers or how the timing permits an inference of intentional race discrimination.  In any event, with respect to his disciplinary infractions, he identifies no employee who engaged in similar misconduct but was treated more favorably. *See Lewis II*, 934 F.3d at 1185 (explaining that "systematically better treatment of similarly situated employees" is relevant to establishing a convincing mosaic).  The closest he gets is Mr. Adams and Mr. Clark, the white mechanics who Mr. Rafferty initially declined to discipline after they were disrespectful to him in a morning meeting.  But as explained above, Mr. Rafferty did eventually discipline both mechanics, and Mr. Lilley

also disciplined Mr. Rafferty for his inconsistent enforcement of City policy. Thus, for purposes of the City's liability for intentional race discrimination, Mr. Singleton has failed to show that white employees who engaged in similar misconduct were treated more favorably. *Cf. Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (concluding that, in case where the white plaintiff was punished by his black supervisor for a particular rule violation, evidence that a black employee, who was not a strict comparator, had committed the same rule violation but was not punished helped establish the plaintiff's convincing mosaic of circumstantial evidence).[17]

Regarding the "Rob Singleton Rules" and the specific disciplinary infractions for violating them, for which Mr. Singleton presumably cannot identify a comparator, Mr. Singleton fails to produce evidence that Mr. Rafferty's actions were based on or motivated by unlawful race discrimination as opposed to a generalized personality conflict. So too with Mr. Lilley's role in implementing the "Rob Singleton Rules." Mr. Singleton has failed to rebut the legitimate, nondiscriminatory reasons for implementing those rules: that the City wanted to clarify the job responsibilities for the first-ever Service Center Master Mechanic and that Mr. Lilley sought to abide Mr. Singleton's request for additional leadership responsibilities. To the extent that Mr. Lilley was motivated by a desire to "punish" Mr. Singleton for a perceived poor "attitude," such a desire is not itself evidence of race-based discrimination.

---

[17] Although *Jenkins* involved a claim of race discrimination in violation of 42 U.S.C. § 1981, the Court finds its analysis instructive because "[t]he elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context." *Id.* at 1249 (citation omitted).

Finally, to the extent that Mr. Singleton relies on Mr. Willis' report to help establish a convincing mosaic of discrimination, the Court is not persuaded that the report helps him. Mr. Willis did not substantiate any complaints of disparate treatment based on race, let alone any complaint(s) similar to Mr. Singleton's or that would otherwise assist Mr. Singleton in creating a triable issue of fact as to Mr. Lilley's allegedly discriminatory intent. *Cf. id.* at 1251 (concluding that evidence that eighteen white employees had retired, resigned, or transferred since black supervisor took over helped establish plaintiff's convincing mosaic of circumstantial evidence). Therefore, on this record, Mr. Singleton has failed to establish a convincing mosaic of evidence of intentional race discrimination.

### 3. *Quigg* Mixed Motive Theory

In his sur-reply brief, Mr. Singleton for the first time argues that he can prevail on his race discrimination claim based on a mixed motive theory under *Quigg*. Mr. Singleton's sur-reply brief is an improper vehicle in which to introduce a mixed motive theory. The Court discerns nothing in the City's reply brief that warrants Mr. Singleton interposing this new argument for the first time in a sur-reply. This argument could and should have been raised in Mr. Singleton's initial brief in opposition to summary judgment. Thus, the Court declines to consider this untimely argument.

### 4. Conclusion

Considering Mr. Singleton's claim under either the *McDonnell Douglas* burden-shifting framework or the "convincing mosaic" theory, no reasonable jury could conclude that the City's decisions to promote Mr. Rafferty over Mr. Singleton in May 2019, to discipline Mr. Singleton on eight occasions between August 2018 and January 2020, to

require Mr. Singleton to repair a vehicle air conditioner in July 2019, or to implement the "Rob Singleton Rules" were based upon unlawful race discrimination.[18]   Therefore, the City is entitled to summary judgment on Mr. Singleton's race discrimination claim.

### B. Retaliation

Next, Mr. Singleton argues that the City unlawfully retaliated against him based on various actions taken against him by Mr. Lilley.   A Title VII retaliation claim based on circumstantial evidence is ordinarily analyzed under the *McDonnell Douglas* framework. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021).   To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Id.*   If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for its decision. *Id.*   If the employer articulates a legitimate, nonretaliatory reason, the burden shifts back to the employee to establish that the employer's proffered reason "'was not the real basis for the decision, but a pretext' for retaliation." *Id.* (citation omitted).   To survive a motion for summary judgment, the plaintiff must produce evidence sufficient to permit an inference that, but for his protected activity, the employer would not have taken the alleged adverse action. *Id.* at 1294.

The Court will first address each element of Mr. Singleton's prima facie case.

---

[18] Even if the Court considered the *Quigg* mixed motive theory, it would not change the Court's conclusion that the City is entitled to summary judgment on Mr. Singleton's race discrimination claim.  Mr. Singleton has failed to produce sufficient evidence from which a reasonable jury could conclude that his race was a motivating factor for the City's adverse employment actions. *See Quigg*, 814 F.3d at 1239.

### 1. Adverse Employment Action

Contrary to both parties' assertions, an adverse employment action for purposes of a Title VII retaliation claim is an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68 (citation omitted).  Prior to the United States Supreme Court's decision in *Burlington Northern*, the Eleventh Circuit required plaintiffs to show that the employer's action either was an "ultimate employment decision" or was objectively serious enough to alter the terms, conditions, or privileges of employment—the standard advanced by the parties here. *See, e.g.*, *Stavropoulos v. Firestone*, 361 F.3d 610, 616–17 (11th Cir. 2004); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 588 (11th Cir. 2000).  However, the Eleventh Circuit has made clear that *Burlington Northern* "announced a new rule which redefines the standard for retaliation claims under Title VII." *Crawford*, 529 F.3d at 973; *see also Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) (reaffirming that the adverse employment action standard "applicable to all Title VII retaliation claims is the *Burlington Northern* 'well might have dissuaded' standard, precisely as . . . *Crawford* said").  "This more liberal view of what constitutes an adverse employment action accords an employee protection from a wider range of retaliatory conduct than would be available under the standard applied" in the Eleventh Circuit's pre-*Burlington Northern* cases, including *Stavropoulos* and *Gupta*. *Crawford*, 529 F.3d at 974.   Nonetheless, an employee's decision to engage in protected activity "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68.

Construing his response in opposition to the City's motion for summary judgment liberally, Mr. Singleton contends that the adverse employment actions for purposes of his race discrimination claim are also adverse employment actions for purposes of his retaliation claim: the imposition of various disciplinary actions between August 2018 and January 2020; the City's failure to promote him to a Garage Superintendent position in May 2019; Mr. Rafferty interrupting his work and ordering him to perform a different task on July 26, 2019; and Mr. Lilley and Mr. Rafferty's imposition of the "Rob Singleton Rules" and Mr. Rafferty subsequently disciplining Mr. Singleton for violating those rules, which caused him to be ineligible for an annual merits-based pay raise.  In Part A.1, *supra*, the Court found that the City's failure to promote Mr. Singleton to the Garage Superintendent position in May 2019 was an adverse employment action for purposes of his race discrimination claim.  It follows that the failure to promote also satisfies the lower "well might have dissuaded" standard for Mr. Singleton's retaliation claim. *See Crawford*, 529 F.3d at 973–74.  By contrast, the Court concludes that the July 26, 2019 task reassignment is not an adverse employment action because, on this record, a one-time order to complete a task beneath the worker's skill level would not dissuade a reasonable worker from making or supporting a charge of discrimination. *Cf. Burlington Northern*, 548 U.S. at 70–71 (upholding jury's determination that an indefinite reassignment of job duties was an adverse employment action where the new duties were "more arduous and dirtier" and the old duties "required more qualifications, which is an indication of prestige," but clarifying that "reassignment of job duties is not automatically actionable").  As for the City's remaining decisions—the disciplinary actions and the imposition of the "Rob

Singleton Rules"—the Court will assume without deciding that each decision "well might have dissuaded" a reasonable employee from making a charge of discrimination and therefore that each constitutes an adverse employment action for purposes of satisfying a prima facie case of retaliation.

### 2. Protected Activity

The Court now addresses Mr. Singleton's purported protected activity.  To engage in protected activity, an employee must explicitly or implicitly communicate a belief that the employer's conduct constitutes unlawful employment discrimination. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016).  The Court agrees with the City that Mr. Singleton's Complaint (doc. 1) alleges two instances of protected activity: (1) on or about September 4, 2018, Mr. Singleton delivered to Mr. Lilley a letter drafted by Mr. Singleton's coworker, Leo Davis, in which Mr. Davis complained about race discrimination in Fleet; and (2) on or about July 30, 2019, Mr. Singleton filed an EEOC charge.  In his response in opposition to summary judgment, Mr. Singleton contends that he engaged in protected activity "when he and Leo Davis drafted complaints of racially discriminatory policies of Fleet's leadership in September 2018." (Doc. 29 at 33).  The Court construes this statement as referencing both the September 4, 2018 letter that Mr. Davis alone drafted and the subsequent letter that Mr. Singleton and Mr. Davis drafted together.[19]

---

[19] Although Mr. Singleton fails to allege in his Complaint (doc. 1) that he and Mr. Davis jointly wrote a second letter, the City does not argue that the Court should decline to consider it on this basis.

Elsewhere in his response in opposition to summary judgment, Mr. Singleton states that in late May 2019, following the "sarcastic sound" incident and Mr. Rafferty's recommending a suspension, Mr. Singleton complained to Ms. Douglas and then to Mr. Pierce about unfair treatment by both Mr. Lilley and Mr. Rafferty.  The City apparently construed the statements in Mr. Singleton's response as an argument that Mr. Singleton engaged in protected activity when he complained to Ms. Douglas and then to Mr. Pierce: the City devoted a portion of its reply brief to this topic and submitted a declaration from Mr. Pierce that had not been cited in the City's opening brief, in which Mr. Pierce attested that he did not recall Mr. Singleton mentioning or alluding to race when he complained about Mr. Lilley and Mr. Rafferty.  The City also pointed out that Mr. Singleton did not allege in his Complaint that he engaged in this protected activity, but the City does not expressly argue that the Court should decline to consider it on this basis.

In his sur-reply brief, Mr. Singleton suddenly claims that he had engaged in protected activity on *twelve* occasions.[20]  Mr. Singleton's sur-reply brief is an improper

---

[20] The occasions are:

> [W]hen Leo Davis presented their list of discriminatory grievances to Mark Willis on September 28, 2018; when Mr. Singleton interviewed with Mark Willis about the discriminatory practices in Fleet contemporaneous to Mr. Davis' September 28 interview; when Mr. Singleton met with Carmen Douglas in May 2019 to complain about discriminatory practices against him by Ronnie Rafferty and Fleet leadership; when Singleton met with Tom Pierce in May 2019 to complain about Ronnie Rafferty and Fleet leadership's discriminatory practices against him; when Singleton expressed disagreement with a suspension recommendation and delivered a letter alleging "ongoing adverse employment action" against him in a June 3, 2019 meeting with Pierce and Lilley; when Singleton expressed he was being targeted and unfairly disciplined when he met with Pierce, Lilley and Rafferty on June 4; when on June 5, 2019, Singleton submitted a rebuttal letter which detailed his specific contention that "adverse action," "retaliation," and "pretext" were reasons for the June 4 disciplinary action imposed; when Singleton again complained to Lilley about discriminatory disciplinary practices within Fleet on July 29, 2019; when Singleton filed his EEOC complaint on July 30, 2019; on August 28, 2019

vehicle in which to introduce arguments that he engaged in this volume of protected activity over and above what he argued in his initial response in opposition to summary judgment or alleged in his Complaint.  The Court discerns nothing in the City's reply brief that warrants Mr. Singleton interposing these new arguments for the first time in a sur-reply.  These arguments could and should have been raised in Mr. Singleton's initial brief in opposition to summary judgment.  Thus, the Court will analyze only whether the following five events constitute protected activity: (1) Mr. Singleton delivering the "Davis letter" to Mr. Lilley on September 4, 2018; (2) Mr. Singleton and Mr. Davis drafting a second letter complaining about discrimination, which Mr. Davis delivered to Ms. Douglas on September 28, 2018; (3) Mr. Singleton complaining to Ms. Douglas in May 2019; (4) Mr. Singleton complaining to Mr. Pierce in May 2019; and (5) Mr. Singleton filing an EEOC charge on July 30, 2019.

The City concedes that filing an EEOC charge is protected activity. (Doc. 29 at 15-16).  Because the City did not argue in its opening brief that delivery of the Davis letter did not constitute protected activity, the Court will assume without deciding that it was protected activity.  Additionally, the Court will assume without deciding that Mr. Singleton

---

when he refused to sign his performance evaluation but instead, wrote a rebuttal to the evaluation complaining that Fleet, (1) inhibited his employment growth, (2) assigned him to lower level mechanic work as a "road man," (3) failed to promote him in favor of less qualified people, and, (4) implemented policies that lacked fairness and honesty; when on January 6, 2020 Singleton complained about being treated unfairly when it comes to being late for work due to family illnesses; and, when Singleton filed his complaint before this Court on November 4, 2020.

(Doc. 36 at 9-10) (citations omitted).

engaged in protected activity when he and Mr. Davis jointly drafted a second letter which Mr. Davis delivered to Ms. Douglas on September 28, 2018.

The Court turns next to Mr. Singleton's complaints to Ms. Douglas and to Mr. Pierce in May 2019. As a threshold matter, as the City points out, Mr. Singleton did not allege in his Complaint that he ever complained to Ms. Douglas or Mr. Pierce. Even if he had, he fails to produce sufficient evidence that he explicitly or implicitly communicated to Ms. Douglas or Mr. Pierce that the conduct complained of constituted unlawful employment discrimination. *See Furcron*, 843 F.3d at 1311. Although Mr. Singleton complained to Ms. Douglas about "mistreatment" by Mr. Rafferty and complained to Mr. Pierce that he was being "targeted" by Mr. Lilley and Mr. Rafferty, Mr. Singleton has produced insufficient evidence demonstrating that he explicitly or implicitly communicated to Ms. Douglas or Mr. Pierce that this treatment "was in any way related to [Mr. Singleton's] race." *See Jeronimus v. Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005) (per curiam) (finding no protected activity where employee sent an email complaining of being "singled out," subjected to "a campaign of harassment," and working in a "hostile environment" but did not suggest that this treatment was related to employee's race or sex).[21] Thus, Mr. Singleton has failed to produce sufficient evidence demonstrating that he engaged in protected activity in May 2019 when he complained to Ms. Douglas or to Mr. Pierce.

---

[21] While the Court recognizes that *Jeronimus* is an unpublished opinion, the Court finds its analysis persuasive.

### 3. Causal Connection

The City argues that Mr. Singleton cannot satisfy a prima facie case of retaliation because he cannot establish a causal connection between his protected activity and any alleged adverse employment action.  A plaintiff can establish a causal connection by showing that the employer knew about his protected activity and there was a close temporal proximity between this knowledge and the adverse action. *Tolar*, 997 F.3d at 1295.  A retaliation claim fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  The Eleventh Circuit has held that a three-month delay between protected activity and an adverse employment action, without more, is insufficient to demonstrate the requisite causal connection. *See id.* at 1221; *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam).

Having assumed without deciding that Mr. Singleton delivering the Davis letter to Mr. Lilley on September 4, 2018 was protected activity, which Mr. Lilley knew about when it was delivered, Mr. Singleton nonetheless cannot demonstrate a causal connection between this protected activity and any adverse employment action.  Because the August 2018 disciplinary action predates the delivery of the Davis letter, the City could have not disciplined Mr. Singleton in retaliation for this protected activity.  The remaining adverse employment actions—the December 12 and 13, 2018 disciplinary actions; the failure to promote Mr. Singleton to Garage Superintendent in May 2019; the June 4, 2019 disciplinary action; and the implementation of the "Rob Singleton Rules" on July 31,

2019[22]—occurred too remotely in time from the protected activity to permit an inference of a causal connection. The shortest delay is three months, which is insufficient here as a matter of law to demonstrate a causal connection. *See Higdon*, 393 F.3d at 1220. The lengthier delays between the protected activity and the remaining adverse actions also preclude a showing of causation.

Having assumed without deciding that Mr. Singleton and Mr. Davis jointly drafting a second letter complaining about discrimination was protected activity, Mr. Singleton nonetheless cannot demonstrate a causal connection between this protected activity and any adverse employment action. The Court will assume without deciding that Mr. Lilley knew about this complaint on or about March 11, 2019, when he received Mr. Willis' report. Because the August and December 2018 disciplinary actions predate Mr. Lilley's knowledge of this complaint, Mr. Singleton could not have been disciplined in retaliation for this protected activity. The implementation of the "Rob Singleton Rules" occurred four and a half months after this protected activity, which is insufficient to demonstrate a causal connection. *See id.* The failure to promote Mr. Singleton to Garage Superintendent occurred approximately two and a half months after the protected activity, and Mr. Singleton's discipline for the sarcastic sound incident occurred just shy of three months after. In the absence of other evidence of causation, which Mr. Singleton does not identify, the Court finds that these passages of time are too long to establish a causal connection.

---

[22] The Court does not consider the discipline imposed on Mr. Singleton on June 5, 2019; August 2, 2019; or August 13, 2019; because Mr. Rafferty, not Mr. Lilley, was the decisionmaker. Even if the Court did consider them, they would not change the Court's conclusion because they also occurred too remotely in time from Mr. Singleton's protected activity to permit an inference of a causal connection.

*See Herron-Williams v. Ala. State Univ.*, 805 F. App'x 622, 632 (11th Cir. 2020) (per curiam) (finding that the plaintiff failed to establish a causal connection between her protected activity and the adverse employment action because "at least two months had passed" between the employer's knowledge of the activity and the adverse action).[23]

Mr. Singleton filed his EEOC charge on July 30, 2019, and there is evidence that Mr. Lilley knew about the EEOC charge on July 31, 2019.  Because the August 2018 discipline, the December 2018 disciplines, the May 2019 failure to promote, and the June 4, 2019 discipline all predate the filing of the EEOC charge, the City could not have made those decisions in retaliation for the EEOC charge.  Mr. Singleton also has produced insufficient evidence to demonstrate a causal connection between the filing of the EEOC charge and the implementation of the "Rob Singleton Rules."  Although the Rules were implemented on July 31, 2019, the day Mr. Lilley learned of the EEOC charge, Mr. Lilley had directed Mr. Singleton and Mr. Rafferty to create the Rules two days earlier.  Thus, the action of the decisionmaker who knew about the EEOC charge—Mr. Lilley—predated both the filing of the EEOC charge and the decisionmaker's knowledge thereof; therefore, no causal link exists between the EEOC charge and the Rules.  Accordingly, Mr. Singleton has failed to demonstrate a causal connection between the filing of his EEOC charge and any protected activity.

---

[23] While the Court recognizes that *Herron-Williams* is an unpublished opinion, the Court finds its analysis persuasive.

### 4.   Legitimate, Nonretaliatory Reasons

Assuming, *arguendo*, that Mr. Singleton had been able to establish a prima facie case of retaliation, the burden of production would then shift to the City to produce legitimate, nonretaliatory reasons for its actions. *See Tolar*, 997 F.3d at 1289.  For all the same reasons stated *supra* in Part A.1, the City's explanations for its decisions meet this burden.

### 5.   Pretext

Even if he had satisfied his prima facie case, Mr. Singleton has nonetheless failed to produce sufficient evidence of pretext to survive summary judgment on his retaliation claim.  Just as with his discrimination claim, Mr. Singleton has failed to rebut the City's legitimate reasons for disciplining him, not promoting him in May 2019, or for implementing the "Rob Singleton Rules."  For all the same reasons discussed *supra*, Mr. Singleton has neither shown that the City's proffered reasons are false nor that the real reason was unlawful retaliation. *See Tolar*, 997 F.3d at 1298.

### 6.   Conclusion

No reasonable jury could conclude that, but for Mr. Singleton's protected activity, the City would not have disciplined him, promoted Mr. Rafferty over him in May 2019, or implemented the "Rob Singleton Rules." *See id.*  Therefore, the City is entitled to summary judgment on Mr. Singleton's retaliation claim.

## C.  Hostile Work Environment

Finally, Mr. Singleton contends that he was subjected to a racially hostile work environment based on the following allegedly disparate treatment: the City's failure to

promote Mr. Singleton to Garage Superintendent in May 2019; the imposition of six disciplinary actions upon him between December 2018 and August 2019; and the implementation of the "Rob Singleton Rules."  Title VII is violated when "the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (alterations in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  To prevail on a racially hostile work environment claim, the plaintiff must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014).

The City argues that Mr. Singleton's claim fails because he cannot show that the purported harassment was based on his race, that the harassment was sufficiently severe or pervasive, or that the City can be held liable.  For all of the reasons explained *supra* in Part A, the Court finds that Mr. Singleton has failed to produce sufficient evidence that the harassment he complains of was based on his race.  Because the Court concludes that Mr. Singleton cannot show that the harassment was based on race, the Court pretermits discussion of the remaining elements of his claim.  Thus, the City is entitled to summary judgment on Mr. Singleton's hostile work environment claim.

**D.  Mr. Singleton's Request that Summary Judgment Be Granted in His Favor**

In his sur-reply brief, Mr. Singleton argues in passing that *he* is entitled to summary judgment.  To the extent that Mr. Singleton was making a motion for summary judgment, and assuming without deciding that such motion was properly before the Court,[24] Mr. Singleton's motion is denied in light of the Court's determination that summary judgment is due to be granted in favor of the City.

## VI.  CONCLUSION

For the reasons stated, it is hereby ORDERED that the Defendant's motion for summary judgment (doc. 24) is GRANTED.

A separate Final Judgment will enter.

DONE this 25th day of April, 2022.

_____ /s/ Emily C. Marks _____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

---

[24] The dispositive motions deadline passed on January 21, 2022, (doc. 23), and Mr. Singleton filed his sur-reply on March 10, 2022, (doc. 36).